Fboessel, J.
Petitioner Andrew Harbison, Sr., purchased certain real property located at 35 Cumberland Avenue in the city of Buffalo on January 5, 1924. Shortly thereafter he erected a 30- by 40-foot-frame building thereon, and com *556 menced operating a cooperage business, which, with his son, he has continued to date. The building has not been enlarged, and the volume of petitioners’ business is stated to be the same now as then. The only difference is that, whereas petitioners formerly dealt mainly with wooden barrels, they now recondition, clean and paint “used” steel drums or barrels. No issue of that difference is made here. These drums, or barrels, are stacked to a height of about 10 feet in the yard, and on an average day about 600 or 700 barrels are stored there.
When petitioner Andrew Harbison, Sr., established his business in 1924, the street upon which it was located was an unpaved extension of an existing street, the city operated a dump in the area, and there was a glue factory in the vicinity. At the present time, the glue factory has gone, and there are residences adjoining both sides of petitioners’ property and across the street. The change in the surrounding area is reflected by the fact that in 1924 the land was unzoned, but since 1926 (except for the period between 1949 and 1953, when it was zoned for business), the land has been zoned for residential use; and it is presently in an “ R3 ” dwelling district.
Thus it is clear that at the time of the enactment of the first zoning ordinance affecting the premises, petitioners had an existing nonconforming use, that is, the conduct of a cooperage business in a residential zone. In 1936, under an ordinance which included the operations of petitioners in a definition of “ junk dealers ”, petitioners applied for and received a license to carry on their business. Licenses were obtained by petitioners every year from 1936 through the fiscal year of 1956.
However, the ordinances of the City of Buffalo were amended, effective as of July 30, 1953, so as to state in chapter LXX (§ 18): “ 1. Continuing existing uses: Except as provided in this section,- any non-conforming use of any building, structure, land or premises may be continued. Provided, however, that on premises situate in any ‘ R ’ district each use which is not a conforming use in the ‘ R5 ’ district and which falls into one of the categories hereinafter enumerated shall cease or shall be changed to a conforming use within 3 years from the effective date of this amended chapter. The requirements of this subdivision for the termination of non-conforming uses *557 shall apply in each of the following cases: * * *. (d) Any junk yard”. (Defined in § 23, subd. 24.)
On November 27, 1956 the director of licenses of the City of Buffalo sent a letter to petitioners stating: “ At a meeting of the Common Council under date of November 13,1956 * * * [it] evinced its intention not to amend or modify the provisions of Chapter 18, Subdivision I of Chapter LXX of the Ordinances relating to non-conforming uses by junk yards * * * in ‘ B ’ districts. * * * you are hereby notified to discontinue the operation of your junk yard * * * at once ’ ’. A subsequent application by petitioners for a wholesale junk license and one for a “ drum reconditioning license ” were refused on the ground that “ said premises lie within an area zoned as ‘ B3 ’ Dwelling District * * * and the operation of a junk yard and the outside storage of used materials is prohibited therein ”. Petitioners then brought this article 78 proceeding in the nature of mandamus in which they sought an order directing the city to issue a wholesale junk license to them, and the lower courts sustained them.
On this appeal, the City of Buffalo argues (1) that petitioners did not have a lawful nonconforming use when the zoning ordinance was enacted in 1926, since at that time they had not complied with an ordinance enacted in 1892 requiring the licensing of wholesale junk dealers; (2) that petitioners are not entitled to the peremptory grant of a license since they have not enclosed their premises with a solid wood or sheet metal fence or masonry wall not less than 6 feet high, as required by section 194 of article XIII of chapter V of the ordinance, and (3) that the ordinance, held invalid by the courts below, is a valid exercise of the police power.
The first point need not detain us long. The ordinance of 1892, upon which the city relies, related to “ the business of purchasing or selling old silver, iron, brass, copper scraps or other secondhand or partially ruined or damaged materials, [or] carry [ing] on * * * a junk shop ”. It is argued that this ordinance does not clearly encompass petitioners’ business of repairing and reconditioning barrels. In any event, I might note that petitioners operated a licensed wholesale junk business from 1936 to 1956, and the city never raised the fore *558 going objection on any of the applications for renewal of the license. Hence this argument has no merit.
Nor does the second point appear to be a sound ground for refusal to issue a license here. If, as appears, petitioners have not complied with the letter of the ordinance since their property is enclosed by a picket fence rather than one of solid wood or metal, an order directing the issuance of a license could readily be conditioned upon compliance with such provisions inasmuch as petitioners are quite willing to comply with this requirement. It may be noted that this defense was not interposed until the close of the hearings.
In the major point involved on this appeal, the city argues that the ordinance requiring the termination of petitioners’ nonconforming use of the premises as a junk yard within three years of the date of said ordinance is a valid exercise of its police power. Its claim is not based on the theory of nuisance (see People v. Miller, 304 N. Y. 105, 107, and cases there cited; Noel, Retroactive Zoning and Nuisances, 41 Col. L. Rev. 457), and indeed this record contains little evidence as to the manner of operation of petitioners’ business and the nature of the surrounding neighborhood. Rather, in this case, the city bases its claim largely on out-of-State decisions which have sustained ordinances requiring the termination of nonconforming uses or structures after a period of permitted continuance, where such “ amortization ” period was held reasonable.
When zoning ordinances are initially adopted to limit permissible uses of property, or when property is rezoned so as to prevent uses of property previously allowed, a degree of protection is constitutionally required to be given owners of property then using their premises in a manner forbidden by the ordinance. Thus we have held that, where substantial expenditures were made in the commencement of the erection of a building, a zoning ordinance may not deprive the owner ,■ of the “vested right” to complete the structure (People ex rel. Ortenberg v. Bales, 250 N. Y. 598; see City of Buffalo v. Chadeayne, 134 N. Y. 163, 165). So, where the owner already has structures on the premises, he cannot be directed to cease using them (see Matter of 440 East 102nd St. Realty Corp. v. Murdock, 285 N. Y. 298, 304-305), just as he has the right to continue a prior business carried on there (Town of Somers *559 v. Camarco, 308 N. Y. 537; Matter of Crossroads Recreation v. Broz, 4 N Y 2d 39; People v. Miller, supra).
However, where the benefit to the public has been deemed of greater moment than the detriment to the property owner, we have sustained the prohibition of continuation of prior nonconforming uses. These cases involved the prior use of property for parking lots (People v. Wolfe, 272 N. Y. 608, motion for reargument denied 273 N. Y. 498; People v. Kesbec, Inc., 281 N. Y. 785, motion for reargument denied 282 N. Y. 676). We have also upheld the restriction of projected uses of the property where, at the time of passage of the ordinance, there had been no substantial investment in the nonconforming use (e.g., New York Trap Rock Corp. v. Town of Clarkstown, 3 N Y 2d 844; Rice v. Van Vranken, 255 N. Y. 541; Matter of Fox Lane Corp. v. Mann, 243 N. Y. 550). In these cases, there is no doubt that the property owners incurred a loss in the value of their property and otherwise as a result of the fact that they were unable to carry out their prospective uses; but we held that such a deprivation was not violative of the owners’ constitutional rights. In People v. Miller (supra, p. 108), we explained these cases by stating that they involved situations in which the property owners would sustain only a 1 ‘ relatively slight and insubstantial ” loss.
It should be noted that even where the zoning authorities may not prohibit a prior nonconforming use, they may adopt regulations which restrict the right of the property owner to enlarge or extend the use or to rebuild or make alterations to the structures on the property (Matter of Koeber v. Bedell, 280 N. Y. 692; Matter of Cordes v. Moore, 308 N. Y. 761; Marcus v. Village of Mamaroneck, 283 N. Y. 325; Town of Hempstead v. Goldblatt, 4 A D 2d 970, motion for leave to appeal denied 4 N Y 2d 674; see Matter of Crossroads Recreation v. Broz, supra).
As these cases indicate, our approach to the problem of permissible restrictions on nonconforming uses has recognized that, while the benefit accruing to the public in terms of more complete and effective zoning does not justify the immediate destruction of substantial businesses or structures developed or built prior to the ordinance (People v. Miller, supra, p. 108), the policy of zoning embraces the concept of the ultimate1 *560 ? elimination of nonconforming uses, and thus the courts favor reasonable restriction of them. But, where the zoning ordinance could have required the cessation of a sand and gravel business on one year’s notice, we have held it unconstitutional (Town of Somers v. Camarco, 308 N. Y. 537, supra).
The development of the policy that nonconforming uses should be protected and their existence preserved at the stage of development existing at the time of passage of the ordinance seems to have been based upon the assumption that the ultimate ends of zoning would be accomplished as the nonconforming use terminated with time. But this has not proven to be the case, as commentators have noted that the tendency ' of many of these uses is to flourish, capitalizing on the fact that no new use of that nature could be begun in the area (see, e.g., 9 IT. Chi. L. Rev. 477, 479, 481; 102 IT. Pa. L. Rev. 91, 94; 35 Va. L. Rev. 348, 352-353; 1951 Wis. L. Rev. 685). Because of this situation, communities have sought new forms of ordinances restricting nonconforming uses, and in particular have turned to provisions which require termination after a given period of time.
With the exception of a decision of the Ohio Supreme Court (which may be explained on the basis of the particular language and application of the ordinance) in City of Akron v. Chapman (160 Ohio St. 382 [criticized in 67 Harv. L. Rev. 1283]), the decisions have sustained ordinances where the time provided was held reasonable (Livingston Rock & Gravel Co. v. County of Los Angeles, 43 Cal. 2d 121, 123-127; City of Los Angeles v. Gage, 127 Cal. App. 2d 442, 453-458; Standard Oil Co. v. City of Tallahassee, 183 F. 2d 410, cert. denied 340 U. S. 892; Spurgeon v. Board of Comrs. of Shawnee County, 181 Kan. 1008; Grant v. Mayor & City Council of Baltimore, 212 Md. 301; State ex rel. Dema Realty Co. v. Jacoby, 168 La. 752; State ex rel. Dema Realty Co. v. McDonald, 168 La. 172, cert. denied 280 U. S. 556; see Robinson Brick Co. v. Luthi, 115 Col. 106, 111-112; City of Corpus Christi v. Allen, 152 Tex. 137, 142; Stoner McCray System v. City of Des Moines, 247 Iowa 1313, 1320; United Adv. Co. v. Borough of Raritan, 11 N. J. 144, 152).
A number of States and municipal bodies have adopted statutes authorizing this approach to the problem (as, e.g., 111. Ann. Stat., eh. 24, § 73-1; 3 Ya. Code [1950], § 15-843; *561 see, also, list in n. 1 in Grant v. Mayor & City Council of Baltimore, supra); and the textwriters generally express the opinion that they would be constitutional if reasonable (1 Antieau on Municipal Corporation Law, § 7.03 [3]; Bassett on Zoning, pp. 115-116; 8 McQuillin on Municipal Corporations [3d ed.], § 25.190; see, also, Law Reviews cited supra). Bassett, in his text on Zoning, states (p. 115) that “ Several ordinances in Long Island provide [for] * * * the ousting of automobile junk yards with accessory buildings * * * the owner being given from three to six years to amortize.”
Leaving aside eminent domain and nuisance, we have often, stated in our decisions that the owner of land devoted to a prior nonconforming use, or on which a prior nonconforming structure exists (or has been substantially commenced), has the right to continue such use, but we have never held this right may continue virtually in perpetuity. Now that we are for the first time squarely faced with the problem as to whether or not this right may be terminated after a reasonable period, during which the owner may have a fair opportunity to amortize his investment and to make future plans, we conclude that it may be, in accordance with the overwhelming weight of authority found in the courts of our sister States, as well as with the textwriters and commentators who have expressed themselves upon the subject.
With regard to prior nonconforming structures, reasonable termination periods based upon the amortized life of the struc-1 ture are not, in our opinion, unconstitutional. They do not \ compel the Immediate destruction of the improvements, but envision and allow for their normal life without extensive alterations or repairs. Such a regulation is akin to those we have sustained relating to restrictions upon the extension or substantial repair or replacement of prior nonconforming structures.
As to prior nonconforming uses, the closest case we have had is Town of Somers v. Camarco (308 N. Y. 537, supra; see discussion thereof in this connection in 7 Syracuse L. Rev. 158-161). In that case we held that, in view of defendant’s investment and the business which had been built up and carried on over the years, the provisions of the ordinance which required defendant to apply for a permit to continue its busi *562 ness every year, and provided further that on the termination of any approval period any structure or improvement on the premises could be ordered removed and the premises restored to their original condition as nearly as practicable, were unreasonable. There the land involved had unusual resources which made it especially suitable for the nonconforming use carried on; the improvements were necessary for the operation of the business, and the period of termination was unreasonably short. Under these circumstances the ordinance would have deprived the property owner of his ‘1 vested rights ’ As was pointed out in the opinion (pp. 540-541), “ The courts, in order to afford stability to property owners who do have existing nonconforming uses, have imposed the test of reasonableness upon such exercise of the police powers. Therefore broad general rules and tests, such as expressed in People v. Miller (304 N. Y. 105), must always be considered in this context. ’ ’
If, therefore, a zoning ordinance provides a sufficient period of permitted nonconformity, it may further provide that at the end of such period the use must cease. This rule is analogous to that with respect to nonconforming structures. In ascertaining the reasonable period during which an owner of property must be allowed to continue a nonconforming use, a -^balance must be found between social harm and private injury. We cannot say that a legislative body may not in any case, after consideration of the factors involved, conclude that the termination of a use after a period of time sufficient to allow a property owner an opportunity to amortize his investment and make other plans is a valid method of solving the problem.
To enunciate a contrary rule would mean that the use of land for such purposes as a tennis court, an open air skating rink, a junk yard or a parking lot — readily transferable to (another site — at the date of the enactment of a zoning ordinance -vests the owner thereof with the right to utilize the land in that manner in perpetuity, regardless of the changes in the neighborhood over the course of time. In the light of our ever expanding urban communities, such a rule appears to us to constitute an unwarranted restriction upon the Legislature in dealing with what has been described as “ One of the major problems in effective administration of modern zoning ordinances ” (1951 Wis. L. Rev. 685). When the termination pro *563 visions are reasonable in the light of the nature of the business of the property owner, the improvements erected on the land, the character of the neighborhood, and the detriment caused the property owner, we may not hold them constitutionally invalid.
In the present case, the two lower courts have expressed the view that, “ Whatever the law may be in California or Florida or other jurisdictions, in this State ” no regulation infringing at any time the perpetual right of an owner to continue a prior nonconforming use is valid. Accordingly, neither court considered the question of whether the particular period prescribed by the ordinance was reasonable under the facts of this case.
Their conclusion is not in accord with the general rule applicable to protection of nonconforming uses as stated in People v. Miller (304 N. Y. 105, supra). In that case we decided that where the enforcement of an ordinance requiring the termination of a prior nonconforming use caused “ relatively slight and insubstantial” loss to the property owner, it would be constitutional. While it is true that the ordinance there involved did not have an “amortization” provision, nevertheless the general test enunciated is no less germane when such a provision is included in the ordinance. As previously pointed out, the period of “ amortization ” allowed by the ordinance is a crucial factor in determining whether the ordinance has been constitutionally applied in a given case.
Here, petitioners are engaged in the business of reconditioning barrels or used steel drums. We are told that the value of the property together wth the improvements is $20,000; but there is no indication of the relative value of the land and improvements separately. It was further alleged that the improvement consists of a 30- by 40-foot-frame building erected in 1924, and, in addition thereto, petitioners claim that at the insistence of the City of Buffalo, three years before the ordinance went into effect, they were obliged to install a special sewage system at a cost of $2,000 and a boiler at a cost of $700.
Material triable issues of fact thus remain, and a further hearing should adduce evidence relating to the nature of the surrounding neighborhood, the value and condition of the; improvements on the premises, the nearest area to which peti *564 r-|tioners might relocate, the cost of such relocation, as well as '«any other reasonable costs which bear upon the kind and amount of damages which petitioners might sustain, and whether petitioners might be able to continue operation of their business if not allowed to continue storage of barrels or steel rums outside their frame building. It is only upon such evidence that it may be ascertained whether the resultant injury to petitioners would be so substantial that the ordinance would be unconstitutional as applied to the particular facts of this case.
The order of the Appellate Division should be reversed, without costs, and the matter remanded to Special Term for a trial of the material issues and further proceedings as outlined in this opinion.