## NATHAN M. HARRIS ET AL. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

[No. 723, September Term, 1976.]

*Decided April 12, 1977.*

The cause was argued before DAVIDSON, MELVIN and LISS, JJ.

*Jonathan A. Azrael,* with whom were *Azrael & Gann* on the brief, for appellants.

*John N. Spector,* with whom were *Benjamin L. Brown* and *William Hughes* on the brief, for appellee Mayor and City Council of Baltimore. *Mark Pollak,* with whom were *Kenneth A. Reich* and *Donald F. Burke* on the brief, for other appellees.

Liss, J., delivered the opinion of the Court.

This appeal concerns itself with the hotly contested and long delayed effort of the Mayor and City Council of Baltimore to "rollback" the occupancy of non-conforming multiple family structures which were converted to four or more dwelling units.

The appellants include Nathan Harris and a number of other multiple family dwelling owners and the Property Owners Association of Baltimore, Inc. The appellees, in addition to the City, include a number of intervenors (neighborhood improvement associations and other property owners in the affected areas) who sought and were granted permission to intervene as defendants in the trial court. They are represented by counsel who participated in the preparation and presentation of this case to this Court; their position is essentially the same as that urged by the City.

The appellants filed a bill for declaratory judgment and injunctive relief seeking to prevent the City from enforcing certain rezoning ordinances enacted by the City on the grounds that the ordinances were unconstitutional and void under the Fourteenth Amendment to the Constitution of the United States, and under Article 23 of the Declaration of Rights of the Maryland Constitution in that the ordinances were an arbitrary, unreasonable and capricious exercise of the police powers of the City; and further that the effect of the ordinances amounted to a taking of property without due process of law, and without payment of just compensation. In the alternative, if the ordinances be upheld as constitutional, the appellees requested that the court declare the effective dates of the ordinances to be July 2, 1976 and

April 20, 1979, and that the City be enjoined from enforcing the ordinances prior to those dates. The case was heard in the Circuit Court of Baltimore City before Judge Harry A. Cole who issued a well reasoned memorandum opinion in which he declared the ordinance to be constitutional and denied the prayer for injunctive relief. It is from these findings and the order implementing them that this appeal was taken. We agree with the conclusions of the trial court and shall affirm.

There are two questions raised by the appellants for our determination.

I. (a) Is the termination and rollback of non-conforming dwelling units required by the rezoning ordinances, as adopted by the City, a valid exercise of the City's police power?

(b) Is the rollback provision an unconstitutional taking of property without due process and without just compensation?

II. Are the classifications established by the rollback ordinances reasonable and valid?

## I. (a)

In April, 1962, the Mayor and City Council of Baltimore adopted Ordinance No. 1162 known as the rollback ordinance. The purpose of its enactment as stated in new Section 13A to Article 40 of the Baltimore City Code was to prevent the extension, expansion or enlargement of non-conforming uses of land, building or structure and to provide a time limit or tolerance period during which the non-conforming uses were to be extinguished or rolled back.

The rollback provisions were applicable to structures non-conforming as to density limitations in those residential districts zoned R-8, R-9 and R-10. These areas are the densest residential districts permitted in Baltimore City and are concentrated in the inner-city neighborhoods. Such neighborhoods as Bolton Hill, Harlem Park, Locust Point, Federal Hill and Charles Village were affected by the ordinance. It is to be noted that extensive renewal and

redevelopment of the areas was contemplated at the time of the adoption of the ordinance and has occurred in the intervening decade and a half.

Ordinance No. 1162 was the response of the Mayor and City Council of Baltimore to a study, review and report of a previously appointed Zoning Commission which had reported that the existing zoning ordinance had permitted large areas of the City to suffer overcrowding, and that "overcrowding of dwellings and excessive population densities are among the prime causes of the deterioration of residential areas and the creation of slums." [1] The rollback provisions were specifically designed to overcome some of the problems created by the conversion of structures to multi-family use.

Ordinance No. 1162 was amended by the Mayor and City Council on July 2, 1968 by Ordinance No. 153 which extended the tolerance period for the rollback of non-conforming uses from five to eight years.

On April 20, 1971 the City adopted the new comprehensive zoning ordinance, No. 1051, Section 8.0-5e (2), which provided:

> *"Termination of Non-Complying Dwelling Units.* The number of dwelling units in a structure non-complying as to the minimum lot area requirements of Sections 4.8-2, 4.9-2 and 4.10-2 of this ordinance, which structure is located in an R-8, R-9 or R-10 District and has been converted at any time, whether with or without Board authorization, for four or more dwelling units, shall be reduced and comply with the provisions of the aforesaid Sections 4.8-2, 4.9-2 and 4.10-2 not later than eight years after the effective date of this subsection. Provided, further, that when a district is hereafter reclassified as R-8, R-9 or R-10, the number of dwelling units in any structure non-complying as to the minimum lot area requirements of Sections

---

1. Zoning Commission, New Zoning for Baltimore (1962), p. 1.

4.8-2, 4.9-2 and 4.10-2, as hereinbefore provided, shall be reduced and comply with the provisions of Sections 4.8-2, 4.9-2 and 4.10-2 within eight years after the effective date of the reclassification. Notwithstanding the provisions of this subsection, however, the Board may authorize the continuance of a non-complying dwelling unit or units in any such non-complying structure in accordance with the authority and procedures established in Section 8.0-7 of this chapter."

Section 8.0-7d of the latter ordinance provided:

"Notwithstanding any other provision of this chapter, where any use is required to be terminated under this ordinance and was also required to be terminated or made conforming under any prior ordinance of the Mayor and City Council, the prior ordinance shall govern as to the date of such termination."

In summary, the original rollback ordinance established minimum lot sizes per dwelling unit and required owners of buildings which had been converted to four or more dwelling units to reduce the number of dwelling units to comply with the established lot size. Buildings which had not been so converted, but which were originally built to contain more than four dwelling units, were not required to comply, and buildings which contained three or fewer dwelling units were likewise exempt, regardless of whether or not these buildings conformed to the minimum lot size. Adherence to the rollback provisions was originally required within five years from the effective date, or April 4, 1967. Ordinance No. 153 extended the date of mandatory compliance from five to eight years. The City recodified its zoning ordinance (1051) effective April 20, 1971, and the rollback provisions were reenacted in that ordinance.

Enforcement of the rollback provisions by the City was not begun until 1972 after the adoption of the new comprehensive zoning ordinance. All of the complaining

parties have agreed and stipulated that they own properties which were converted to four or more dwelling units, located in B or C area districts, and that each has been notified by the City that the properties are in violation of Section 8.0-5e (2) of the zoning ordinance, and that the use of one or more dwelling units in each of said properties must be terminated.

The case was submitted to the trial court without "live" testimony and each side presented its case through the affidavits and exhibits of expert witnesses. Both sides waived cross-examination of the experts.

The general rule is that zoning ordinances are entitled to a presumption of constitutional validity and that the burden is upon the party attacking the ordinance to establish clearly its unconstitutionality. *Lucky Stores v. Board of Appeals*, 270 Md. 513, 312 A. 2d 758 (1970); *Gino's of Maryland, Inc. v. Mayor and City Council of Baltimore*, 250 Md. 621, 244 A. 2d 218 (1968); *Eutaw Enterprises, Inc. v. Mayor and City Council of Baltimore*, 241 Md. 686, 217 A. 2d 348 (1966). To prevail the appellants must demonstrate that there is no "real and substantial relation" between the statute or ordinance and the purposes for which it was enacted. *Bowie Inn v. City of Bowie*, 274 Md. 230, 335 A. 2d 679 (1975); *Maryland Board of Pharmacy v. Sav-A-Lot, Inc.*, 270 Md. 103, 311 A. 2d 242 (1973).

The appellants concede the City's power to require the termination of non-conforming dwelling units for the purposes set out in the rollback ordinance, i.e., to remove the adverse effect of non-conforming uses on the orderly development, maintenance and taxable value of other property in the area and to substitute therefor the benefits from a substantial uniformity of permitted uses. They contend that the ordinances at issue are an unlawful exercise of the City's zoning (police) power and a violation of due process. in that they constitute a taking of the appellant's property without just compensation.

The issue of the phaseout of non-conforming uses was first presented to the Court of Appeals in *Grant v. Mayor and City Council of Baltimore*, 212 Md. 301, 129 A. 2d 363

(1957). In that case the Court had before it an ordinance which required the removal of non-conforming billboards from residential neighborhoods within a five-year period. Judge Hammond (later Chief Judge) in a comprehensively researched opinion discussed the philosophy of the phaseout of non-conforming uses.

> "Nonconforming uses have been a problem since the inception of zoning. Originally they were not regarded as serious handicaps to its effective operation; it was felt they would be few and likely to be eliminated by the passage of time and restrictions on their expansion. For these reasons and because it was thought that to require immediate cessation would be harsh and unreasonable, a deprivation of rights in property out of proportion to the public benefits to be obtained and, so, unconstitutional, and finally a red flag to property owners at a time when strong opposition might have jeopardized the chance of any zoning, most, if not all, zoning ordinances provided that lawful uses existing on the effective date of the law could continue although such uses could not thereafter be begun. Nevertheless, the earnest aim and ultimate purpose of zoning was and is to reduce nonconformance to conformance as speedily as possible with due regard to the legitimate interests of all concerned, and the ordinances forbid or limit expansion of nonconforming uses and forfeit the right to them upon abandonment of the use or the destruction of the improvements housing the use." (citations omitted) 212 Md. at 307.

It is generally held that it is unreasonable and unconstitutional for a zoning law to require immediate cessation of non-conforming uses otherwise lawful. *Amereihn v. Kotras*, 194 Md. 591, 71 A. 2d 865 (1950); *Anne Arundel County v. Snyder*, 186 Md. 342, 46 A. 2d 689 (1946); *Des Jardin v. Town of Greenfield*, 262 Wis. 43, 53 N.W.2d 784 (1952); *Standard Oil Co. v. City of Bowling Green*, 244

Ky. 362, 50 S.W.2d 960, 86 A.L.R. 648 (1932); *Jones v. City of Los Angeles*, 211 Cal. 304, 295 P. 14 (1931).

The opinion in *Grant* indicated, at least at that time, that there was some divergence of opinion as to whether a law requiring cessation of non-conforming uses after the expiration of a tolerance or amortization period was constitutional. 212 Md. at 309 n.2. The Maryland courts adopted the view that the elimination of existing non-conforming uses within a reasonable time and with the use of a reasonable amortization scheme provided an equitable means of reconciliation of due process requirements. *Grant* was followed and reaffirmed by *Shifflett v. Baltimore County*, 247 Md. 151, 230 A. 2d 310 (1967) (two year phaseout non-conforming junkyards); *Eutaw Enterprises, Inc. v. Mayor and City Council of Baltimore, supra* (18 months phaseout of non-conforming check cashing services); *Gough v. Board of Zoning Appeals*, 21 Md. App. 697, 321 A. 2d 315 (1974) (two year phaseout for all non-conforming uses conducted on open land not utilizing permanent buildings or structures). These cases establish the general validity of the amortization method of terminating non-conforming uses in Maryland. We hold that the scheme adopted by the Mayor and City Council for the rollback of non-conforming uses, as provided in the instant ordinances, was a valid exercise of the police power of the City of Baltimore.

## I. (b)

We are next required to consider whether the amortization scheme, as adopted in the rollback provisions in these rezoning ordinances, amount to an unconstitutional taking of property without due process and without just compensation.

Appellants urge that *Harbison v. City of Buffalo*, 4 N.Y.2d 553, 176 N.Y.S.2d 598, 152 N.E.2d 42 (1958), accurately states the law with respect to amortization wherein the New York Court of Appeals said:

"With regard to prior nonconforming *structures*, reasonable termination periods based upon the

amortized life of the structure are not, in our opinion, unconstitutional. They do not compel the immediate destruction of the improvements, but envision and allow for their normal life without extensive alterations or repairs. Such a regulation is akin to those we have sustained relating to restrictions upon the extension or substantial repair or replacement of prior nonconforming structures.

As to prior nonconforming uses . . . [the] rule is analogous to that with respect to nonconforming structures. In ascertaining the reasonable period during which an owner of property must be allowed to continue a nonconforming use, a balance must be found between social harm and private injury. We cannot say that a legislative body may not in any case, after consideration of the factors involved, conclude that the termination of a use after a period of time sufficient to allow a property owner an opportunity to amortize his investment and make other plans is a valid method of solving the problem." 4 N.Y.2d at 561-62, 176 N.Y.S.2d at 604-05, 152 N.E.2d at 46.

Where the amortization period is unreasonable, the statutes requiring termination of non-conforming uses have been held unconstitutional. See, e.g., *McCaslin v. City of Monterey Park*, 163 Cal. App.2d 339, 329 P. 2d 522 (1958); *City of LaMesa v. Tweed & Gambrell Planing Mill*, 146 Cal. App.2d 762, 304 P. 2d 803 (1956); *O'Connor v. City of Moscow*, 69 Idaho 37, 202 P. 2d 401 (1949); *Standard Oil Co. v. City of Bowling Green, supra.* We agree that this correctly states the law. The fallacy in appellants' argument, however, arises out of their error in assuming which "investment" was to be amortized. Appellants' experts assumed that their "investment" was the acquisition price of the property and that the proper time frame to be considered should be based on (i) an amortization of the acquisition price over the useful life of the building or (ii) the period of depreciation. The "investment" in these rollback cases is not the entire cost of

the structure (since all but the non-conforming uses will continue to have a useful life), but the cost to be amortized is the original cost of converting the excess non-conforming units. Nor is the amortization period intended to provide an owner with an opportunity to depreciate fully the value of his property. *See Art Neon Co. v. City and County of Denver,* 488 F. 2d 118 (10th Cir. 1973), *cert. denied,* 417 U. S. 932 (1974). As Judge Prescott of the Court of Appeals said in *Stevens v. City of Salisbury,* 240 Md. 556, 570-71, 214 A. 2d 775, 783 (1965):

> "True amortization provisions almost if not universally call for a termination of non-conforming uses after the lapse of a reasonable, specified period in order that the owner may amortize his investment (the reasonableness of the period depends upon the nature of the non-conforming use, the structures thereon, and the investment therein) . . . ."

We are not restricted in our consideration to the reasonableness of the original five year amortization period or its later extension by ordinance to eight years. The passage of time has now extended that period to almost fifteen years since the enactment of the original rollback ordinance. The non-conforming uses undoubtedly existed for a number of years prior to the passage of the ordinance.

Judge Cole in his findings of fact stated:

> "The complainants have not persuaded this court that the useful life of their structures is so much longer than 13 years, or that the necessary expenditures that they would make for the normal maintenance of their properties over 13 years is so much less than the cost of alteration to conform to the new minimum lot sizes, that the rollback provisions have made the complainants victims of an unconstitutional confiscation of their property. Indeed, the complainants' losses are even further reduced by the possibilities of increased tax benefits due to the depreciation on, and business

> investment in, their properties and even further by
> the possibility of increased rents collectible on the
> enlarged apartments in the buildings they own."

We have before us then ordinances which have already provided for those holders of non-conforming uses in the buildings affected an amortization period of fifteen years. We cannot hold that this period is not constitutionally sufficient to avoid the appellants' contention that the ordinance amounts to an unlawful taking of property without due process and just compensation.

There is one other saving grace in the ordinance as adopted. The Zoning Board of Baltimore City is authorized by Chapter 8.0-7b (6) of the ordinance to grant the continuance of a non-conforming dwelling unit or units in a non-complying structure located in the areas covered by the rollback provisions subject to specific criteria set out in the ordinance. The stated purpose of this grant of authority is to effect substantial justice not only for the property owner affected by the rollback ordinance but also for the value, utilization, enjoyment and ultimate development of neighboring properties. Cases of individual hardship can be resolved under this section of the zoning ordinance.

In light of the presumption of constitutionality of the ordinances here considered and the conclusions of fact reached by the chancellor we believe the phasing out of the non-conforming uses over the amortization period existing in this case is a constitutional exercise of the police power of the City.

As a corollary to their argument on this issue, the appellants contend that the termination of the non-conforming dwelling units imposed by Section 8.0-5e (2) requires that they destroy, reduce and/or remove their own property at their own expense, without payment or just compensation. They offer in support of this theory *Leet v. Montgomery County*, 264 Md. 606, 287 A. 2d 491 (1972), and *Stevens v. City of Salisbury, supra.*

We believe these cases to be factually inapposite. In *Salisbury* an ordinance was passed which attempted to clear

an obstruction of view at intersections by setting up an "amortization" scheme for the phasing out of non-conforming uses. The ordinance required the property owners to grade and remove excess soil and structures above a certain height, regardless of how much grading was required and without regard to whether the excess ground elevation resulted from natural causes or from lawful and permissible manmade changes. The Court held this portion of the ordinance unconstitutional because in its opinion the facts did not create a true case of amortization. No such factual situation arises in this case where the controversy is over the period of amortization rather than the existence of an amortization scheme. *Leet* is also inapplicable. In that case the Court had before it a local ordinance which attempted to make a property owner liable to remove from his property, at his expense, abandoned motor vehicles left by trespassers without his knowledge or consent. In no way did this case concern itself with non-conforming uses or with the amortization of these uses.

We find no merit in this contention.

II.

Appellants make a final attack on the constitutionality of the ordinances on the ground that the classifications established are arbitrary and unreasonable. We do not agree.

The Maryland Court of Appeals has consistently held that the question of classification is primarily one for the legislature to decide and courts will not intervene unless that classification is clearly unreasonable or arbitrary. *McBriety v. Mayor and City Council of Baltimore,* 219 Md. 223, 148 A. 2d 408 (1959); *Bevard v. Baughman,* 167 Md. 55, 173 A. 40 (1934). Judge Cole correctly stated the standards by which a classification is tested to be:

"1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is

without any reasonable basis and therefore is purely arbitrary.

2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality.

3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.

4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." *Administrator, Motor Vehicle Administration v. Vogt*, 267 Md. 660, 671, 299 A. 2d 1, 7 (1973), quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369 (1911).

In assessing the reasonableness of the ordinance's distinction between converted and non-converted structures the trial court was persuaded by statement of James Dembeck, one of the City's witnesses, who in his affidavit stated:

"It was also recognized that the greatest problems were with structures that were converted to and contained four or more dwelling units. Although there were some structures that exceeded density limits and contained three or less dwelling units, it was my feeling and that of the Commission that these particular buildings were not generally overcrowded and that the number of problem-creating buildings in this category was insignificant."

The rollback ordinance creates a class of buildings; those *converted* to four or more units, and treats that class uniformly by requiring rollback to the original number of

units constructed or the number of units permitted by law, whichever is greater. There is no requirement that the legislative body treat a problem exhaustively and it may legally leave for a later time other problems of density and overcrowding. *Dandridge v. Williams*, 397 U. S. 471, 90 S. Ct. 1153, 25 L.Ed.2d 491 (1970). As was said in *City of New Orleans v. Dukes*, 427 U. S. 297, 96 S. Ct. 2513, 2517, 49 L. Ed. 2d 511 (1976):

> "Legislatures may implement their program step-by-step . . . in such economic areas, adopting regulations that only ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." (citations omitted)

The purpose of the rollback provision as stated by the Zoning Commission is to alleviate urban blight and to check the proliferation of overcrowded slum conditions in Baltimore City. We believe the classification established by the Mayor and City Council was a reasonable legislative classification enacted in pursuance of the purposes sought to be accomplished. We find the classification violates no fundamental personal rights and is based upon no suspect distinctions such as race, religion or alienage, and that it was a valid exercise of the police power of the Mayor and City Council of Baltimore.

*Order affirmed.*
*Costs to be paid by appellants.*